IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **TRIDENT TRUST COMPANY (UK) LTD**, | : | Case No. 1:07CV893 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING DEFENDANTS' |
| | : | MOTION TO SET ASIDE ENTRY OF |
| **ANGLO-AMERICAN CREDIT UNION,** | : | DEFAULT, GRANTING |
| **INC., et al.,** | : | DEFENDANTS' MOTION FOR |
| Defendants. | : | LEAVE TO FILE ANSWER, AND |
| | : | DENYING PLAINTIFF'S MOTION |
| | : | FOR DEFAULT JUDGMENT |
| | : | |

Before the Court are three motions precipitated by the failure of two defendants to file an answer within the time permitted by the Federal Rules of Civil Procedure: (1) Plaintiff's motion for default judgment against Anglo-American Credit Union, Inc. ("AACU") South Dakota and AACU Delaware (doc. 43 and responsive docs. 48 and 55); (2) AACU South Dakota's and AACU Delaware's motion to set aside the entry of default (doc. 46 and responsive docs. 52 and 58); and (3) AACU South Dakota's and AACU Delaware's motion for leave to file an answer out of rule (doc. 51 and responsive docs. 56, 58, 63, and 67.)  For the following reasons, AACU's[1] motions are GRANTED and Plaintiff's motion is DENIED.

**BACKGROUND**

This lawsuit, filed on October 24, 2007 by Trident Trust Company (UK) Ltd. ("Trident"), concerns the alleged conversion of approximately $18 million in trust funds by AACU.  The trust ("Trust") that is the subject of this lawsuit was established on or about January 18, 2006,

---

[1] AACU South Dakota and AACU Delaware will henceforth be referred to collectively as AACU unless otherwise specified.

1

when Neil Marlow, managing director of Bridford Financial Solutions, Ltd. ("Bridford"), a registered company under British law, and Andrew Derrick John Farmiloe, a solicitor, executed a Trust Deed captioned "For the Establishment of the Optimum Returns (BFIG) Scheme" under which Messrs. Marlow and Farmiloe ("Trustees") agreed to act as co-trustees of a fund to consist of future contributions to be made by prospective investors. (Am. Compl., doc. 27 ¶ 8.) The Trust Deed describes an investment plan whereby investors are guaranteed a minimum return of at least 6% at the end of 52 weeks. The Trust's scheme is hereafter referred to as the "Product."

On March 6, 2006, the Trustees entered into an agreement with Bridford whereby Bridford was appointed as administrator of the Trust. (Sur-surreply Ex. B, doc. 67-3) Bridford was tasked with marketing the Product, handling the investors' checks, and sourcing the bank to which the Trust's funds were to be transferred. (Doc. 27 ¶ 12.) Investors' funds were initially deposited in a Trust account at the Royal Bank of Scotland ("RBS") until Bridford could locate a bank to guarantee the funds through a letter of credit or other technique. On March 26, 2006, Marlow retired as co-trustee and Trident was substituted in his place. (Am. Compl. Ex. B, doc. 27-3.)

In August, Bridford advised Trident that it was conducting discussions with Bankhaus Lampe, a German bank, regarding a guaranty for the funds. Bridford also engaged in discussions with Defendant AACU, an investment manager that, according to Bridford, was to assist in securing the guarantee.

On August 17, 2006, Bankhaus Lampe advised RBS that it was prepared to receive a transfer of the Trust funds into an account in AACU's name. Bankhaus Lampe advised RBS of its plan to secure the return of the capital and 6% interest in the amount of £9,452,000, payable

"at the end of the term of 52 weeks," with securities from an AA-rated Financial Services Authority authorized bank or financial institution. (Am. Compl. Ex. C, doc. 27-4.) Based on this "preadvice" from Bankhaus Lampe, on August 23, 2006, Mr. Farmiloe (Trustee), Mr. Marlow (Trust Administrator), and Trident (Trustee) authorized a transfer of £9,417,207 in Trust funds from RBS to a Bankhaus Lampe account in the name of AACU. (Lobe Aff. Exs. B, C, D, doc. 46-4 to 46-6.)

On August 25, 2006, Bridford entered an agreement with AACU under which AACU was to "provide the Trust with security from at least an A rated FSA authorized Bank or a financial institution." (Lobe Aff. Ex. A, doc. 46-3.) Specifically, AACU was to procure a bank that would "issue a Security whereby the return on the deposit shall be not less than 6% of the principal amount of the deposit," and "[t]he amount issued by the Security will be equal to a minimum amount of 6% which will be paid directly by AACU's Bank into the Optimum Returns (BFIG) Trust at the end of the 52 week deposit period." (Lobe aff. Ex. A, doc. 46-3 ¶¶ 5.2, 5.5.) Mr. Farmiloe, in a September 8, 2006 letter addressed to Bankhaus Lampe with copy to AACU, expressly confirmed that the Trustees

> consent to the Trust funds of £9,452,000 to be placed in the account of Anglo American Credit Union, Inc. (AACU) ***and we authorize AACU funds to do all kinds of financial engineering*** that AACU will judge to accomplish, such as leverages, loans, credit lines, counter guarantees, in order to execute financial, economical, industrial, real estate commercial projects worldwide with any reputable European Bank that AACU deems to be profitable following our agreement with them.

(Lobe Aff. Ex. E, doc. 46-7 (emphasis added).)

On September 5, 2006, Bankhaus Lampe purchased for the account the equivalent of £9,439,763.69 Goldman Sachs notes with a maturity date of 2017. (Am. Compl. Ex. D, doc. 27-

3

5.) The 2017 maturity date of the Security apparently did not comport with Bridford's understanding of the date for the return of funds, and on September 11, 2006, AACU CEO Jacques Lobe executed an addendum to the agreement with Bridford that confirmed that "[t]he purpose of the Security . . . is to secure at the end of 52 weeks i.e. September 5th, 2007 the repayment of the funds transferred by Optimum (i.e. capital of £10,019,120 including the interests of 6%)." (Marlow Decl. Ex. D, doc. 52-2 at 29.)  The addendum further specified that "[a]lthough, the maturity of the Security is until 2017. [sic] This date doesn't affect the return of funds in time.  This means that the Security can be sold or given back at any time." (*Id*.)

On October 9, 2006, Bridford's Mr. Marlow again confirmed in a letter that the Trust "authorise[d] Anglo American Credit Union, Inc. (AACU) to do all kinds of financial engineering worldwide with any reputable European Bank." (Lobe Aff. Ex. F., doc. 46-8.)  Mr. Marlow's letter further stated, "I can confirm that the Trust is aware that funds have been deposited with Bank Leu . . . and these funds can be utilised [sic] in any possible way according to the agreement between AACU and Bridford." (*Id*.)

As the end of the 52-week term, September 5, 2007, drew near, Trident contacted Bridford to confirm arrangements for windup of the Trust and administration of the funds. (Am. Compl. Ex. F, doc. 27-7.)  On July 30, 2007, Mr. Lobe of AACU confirmed to Bridford's Mr. Marlow that "payment back based on the Goldman Sachs notes (9,452,000.00 £ plus 6% interests) are expected to be repaid at the latest on September 5, 2007.  The respective banks are actually making the preparation." (Am. Compl. Ex. G, doc. 27-8.)  On September 7, 2007, Bridford sent checks to Trident "to be sent out to investors for their return of capital plus the 6% guaranteed." (Am. Compl. Ex. H, doc. 27-9.)  Accordingly, on September 13, 2007, Trident's

4

Mr. Grant countersigned 58 investors' checks for a total amount of £10,344,859 and posted them to Bridford for distribution.[2]

Most unfortunately, however, funds were not available in the Trust account at RBS. Several days prior to the expected payback date, Bridford directed BAWAG P.S.K., a bank in Austria, to transfer the Goldman Sachs notes out of Bridford's account and into AACU's account. (Sur-surreply Ex. G, doc. 67-8.) Bridford then authorized the transfer of the notes to an account in the name of AACU at J.P. Morgan Chase in New York. (*Id.* Ex. H, doc. 67-9.) An agreement between AACU and Bridford, dated August 29, 2007, confirms that Bridford approved the transfer of the Goldman Sachs notes to AACU. (Second Lobe Aff. Ex. A, doc. 58-3.) According to that agreement, the transfer of the notes to AACU was authorized on the understanding that 25% would remain in AACU's Fidelity account, 75% would be invested in U.S. Treasury Stock, and 90% of the face value would be used as loan collateral (from a loan on the U.S. Treasury Stock) to repay the Trust capital and interest on September 5, 2007. (*Id.*)

AACU transferred the notes to Fidelity Brokerage Services LLC[3] on September 6, 2007, the day *after* AACU was to return the funds to the Trust. However, the remainder of the plan was not executed, and the Trust capital was never deposited in the Trust's RBS account for distribution to investors. In fact, between September and October 2007, AACU borrowed approximately $7.8 million on margin from the Fidelity account, which funds were deposited into an AACU account at Commerce Bank, NA, in Wilmington, Delaware. (Mauger Decl. ¶¶ 6-

---

[2] According to Bridford, the returned amount included an "additional 2%." (Doc. 27-9.)

[3] Trident named Fidelity Investments as a defendant in its original complaint but, upon discovering that Fidelity Investments is a trade name and is not a duly organized business entity, Trident correctly named Fidelity Brokerage Services LLC as a defendant in the Amended Complaint. (*See* doc. 9 at 1 n. 1.)

7, doc. 32.2.) There is no evidence that AACU invested any of the funds in U.S. Treasury Bonds, and only slightly more than $1.5 million was deposited back into the Trust Account at the RBS. (Sur-surreply Ex. M, doc. 67-13.)

The Fidelity account containing the Goldman Sachs notes is in the name of AACU, and the Trust is not a registered account holder. For this reason, Trident cannot access the notes to repay the Trust investors. Trident made this discovery in October 2007 and subsequently filed this lawsuit. Trident's complaint seeks, among other things, a permanent injunction to enjoin the Defendants from assigning, transferring, or otherwise disposing of the Goldman Sachs notes in the Fidelity account and mandating the transfer of the same to the Trust's RBS account.

On October 24, 2007, Trident moved for a temporary restraining order and preliminary injunction, and Trident's counsel emailed a copy of the Complaint and the Motion for Temporary Restraining Order to AACU CEO Jacques Lobe. (Doc. 55-3.) On October 25, 2007, District Judge Michael Barrett conducted a telephonic conference on the motion in which counsel for Trident and Fidelity participated.[4] Judge Barrett entered a stipulated temporary restraining order enjoining AACU and Fidelity from assigning, transferring, or otherwise disposing of any portion of the Goldman Sachs notes in the Fidelity account. (Doc. 9.) The Stipulated Temporary Restraining Order was served on AACU South Dakota's statutory agent and was emailed to Mr. Lobe by Trident's counsel on October 25, 2007.

On November 21, 2007, Trident filed its Second Amended Complaint to include AACU Delaware as a defendant. AACU Delaware was served with summons and the Second Amended Complaint on November 26, 2007. (Doc. 30.) AACU South Dakota was served with summons

---

[4] Trident notified AACU of the TRO application and the telephone conference, but AACU did not appear. (Docs. 4 ¶ 4; 9 ¶ 1.)

and the Second Amended Complaint on November 27, 2007.  (Doc. 36.)  Pursuant to Fed. R. Civ. P. 12(a)(1), AACU was required to plead or otherwise respond to Trident's Second Amended Complaint on or before December 17, 2007.  However, AACU did not respond prior to that date.  Accordingly, Trident applied for an entry of default as to AACU on December 18, 2007 (doc. 37), and the District Court Clerk recorded an entry of default on January 7, 2008 (doc. 44).  Trident moved for default judgment against AACU on January 4, 2007 (doc. 43), the same day on which counsel for AACU filed a notice of appearance (doc. 42).  Four days later, on January 11, 2008, AACU filed a memorandum in opposition to Trident's motion for default judgment (doc. 48) and separately moved to set aside the entry of default (doc. 46).

**DISCUSSION**

**I.     MOTION TO SET ASIDE ENTRY OF DEFAULT**

AACU moves the Court to set aside the District Court Clerk's entry of default pursuant to Fed. R. Civ. P. 55(c), which provides that "[f]or good cause shown the court may set aside an entry of default."  AACU supports its motion with the affidavits of AACU CEO Jacques Lobe (doc. 46-2) and AACU President Jean-Baptiste Gabsy (doc. 46-14).  These affidavits purport to establish that AACU's failure to respond to Trident's complaint was due to factors beyond AACU's control and that AACU has meritorious defenses to Trident's claims.

The criteria used to determine whether "good cause" has been shown for purposes of granting a motion under Rule 55(c) are (1) whether the plaintiff will be prejudiced from reopening the case; (2) whether the defendant has a meritorious defense; and (3) whether culpable conduct of the defendant led to the default.  *United Coin Meter Co., Inc. v. Seaboard Coastline RR*, 705 F.2d 839, 845 (6th Cir. 1983).  The Court must consider all three factors in

ruling on a motion to set aside an entry of default, but "when the first two factors militate in favor of setting aside the entry, it is an abuse of discretion for a district court to deny a Rule 55(c) motion in the absence of a willful failure of the moving party to appear and plead." *Shepard Claims Service, Inc. v. William Darrah & Assoc.*, 769 F.2d 190, 194 (6th Cir. 1986). The Court will first consider the issue of whether AACU's culpable conduct led to the default and will then consider whether Trident will be prejudiced from reopening the case and whether AACU has a meritorious defense.

        **A.     Culpable Conduct of the Defendant**

A defendant's carelessness is insufficient to constitute culpable conduct. Rather, "[t]o be treated as culpable, the conduct of the defendant must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of its conduct on those proceedings." *Shepard Claims Service, Inc.*, 769 F.2d at 194. When the defaulting party "engages in delaying or obstructing tactics or willfully ignores the processes of the court," district judges are generally reluctant to grant a motion to set aside a default entry. 10A Wright, Miller & Kane, Federal Practice and Procedure, Civil 3d § 2693 (1998); see also *Southern Electrical Health Fund v. Bedrock Services*, 146 F. App'x 772, 777 (6th Cir. 2005) (finding defendant's conduct culpable when he was served with a complaint, a motion for entry of default, the entry of default, the motion for temporary injunction, the grant of the temporary injunction, and the motion for a show cause hearing yet ignored the documents for over eight months). Conversely, "[w]here the defaulting party and counsel have not shown disrespect for the court, . . . the courts have been inclined toward leniency." *Shepard Claims Service, Inc.*, 769 F.2d at 194 (citing 6 Moore's Federal Practice ¶ 55.01[2] at 55-61, 62 (1985 ed.)).

The evidence presented to the Court reveals that AACU disregarded the Complaint and emails from Trident's counsel concerning the lawsuit.  However, the Court does not find that AACU's conduct was sufficiently reckless so as to be considered culpable.  Mr. Lobe concedes that he was aware of Trident's lawsuit at a time when he could have responded in a timely manner, yet he "did not believe that [he] needed to respond." (Doc. 58-2 ¶3.)  Mr. Lobe admits that he received emails from Trident's counsel but that he "did not pay much attention to the emails [he] received in regard to the lawsuit because [his] attention was focused upon getting the funds back to the Trust." (*Id.*)  Additionally, when AACU's statutory agent in the United States transmitted court documents to Mr. Lobe in Paris, France, Mr. Lobe did not act on them but rather forwarded them back to the United States to Mr. Gabsy in "mid-December 2007" even though the deadline for filing a response to Trident's Amended Complaint was December 17, 2007.  (Lobe Aff., doc. 46-2, ¶19; Gabsy Aff., doc. 46-14 ¶ 8.)

However, AACU filed a notice of appearance on January 4, 2007, less than three weeks after AACU was required to plead or otherwise respond to Trident's Second Amended Complaint.  Thus, this case is distinguishable from *Southern Electrical Health Fund*, in which the defendant's willful ignorance of court documents lasted for a period of over eight months, thus constituting culpable conduct.  146 F. App'x at 777.  Accordingly, the Court finds that the conduct of AACU leading to the entry of default was not culpable.

Much more troublesome than the actions of AACU leading up to the entry of default, however, is the fact that Mr. Lobe filed an affidavit in support of AACU's motion to set aside the entry of default that contained material misrepresentations.  In the seven-page affidavit, dated January 11, 2007, Mr. Lobe stated, among other things, that he speaks and reads English on a

9

very limited and basic level; that he did not see the legal papers filed by Trident until mid-December 2007; and that he was not aware that AACU was obligated to return the Trust's funds at the end of one year.  (Doc. 46-2. ¶¶ 3, 7, 19.)[5]

Trident refuted these statements with evidence that Mr. Lobe transacts business in English,[6] had actual notice of the lawsuit in October 2007,[7] and knew that AACU was obligated to return the Trust funds at the end of 52 weeks.[8]  It was only in the face of this evidence that AACU filed Mr. Lobe's "supplemental affidavit," executed January 30, 2007, which contained the information described in the paragraphs above.  (Doc. 58-2.)[9]

---

[5] This same affidavit also was attached to AACU's memorandum in opposition to Trident's motion for default judgment (doc. 48) and AACU's motion for leave to file its answer out of rule (doc. 51).

[6] *See* exhibits to the Declaration of Neil Marlow, doc. 55-2, containing email messages to and from Mr. Lobe in English.

[7] Marlow Decl. Exs. A and B, doc. 55-2 at 4-27 (October 26, 2007 email from Mr. Lobe to Mr. Marlow which communicates that AACU is "sending you attached the Complaint we have received" and facsimile copy of Complaint).

[8] Marlow Decl. Ex. C, doc. 55-2 at 28 (September 6, 2006 email from Mr. Lobe to Mr. Marlow confirming that "in case your clients want to have the money back with the interest of 6 % after 52 weeks, there will be no problem of our side"); *id.* at Ex. D, doc. 55-2 at 29 (September 11, 2006 Addendum executed by Mr. Lobe on behalf of AACU stating that "[t]he purpose of the Security coming from Goldman Sachs . . . is to secure at the end of 52 weeks i.e. September 5th, 2007 the repayment of the funds transferred by Optimum (i.e. capital of £10,019,120 including interests of 6%)").

[9] In this supplemental affidavit, Mr. Lobe "correct[ed]" his previous affidavit by admitting the following:

> I was aware of the lawsuit filed by [sic] AACU but I did not
> believe that I needed to respond.  I was under the impression that
> the actions of AACU to resolve the matter through other means
> would obviate such a need.  I did receive documents from
> Trident's attorney and I did send the Complaint to Neil Marlow on
> October 26, 2007.  After that time, I did not pay much attention to

Mr. Lobe recklessly disregarded the authority of this Court when he submitted a false affidavit in support of AACU's motion to set aside the default. This reckless disregard, however, did not *lead* to the default; it was *in response* to the default. Because AACU's conduct leading to the default was careless but did not rise to the level of an intent to thwart judicial proceedings, this first factor weighs in favor of granting AACU's motion to set aside the entry default. The Court must now proceed to analyze the remaining factors used to determine whether "good cause" has been shown for purposes of granting a motion under Rule 55(c).

B.  **Meritorious Defense**

"In determining whether a defaulted defendant has a meritorious defense '[l]ikelihood of success is not the measure.' Rather, if any defense relied upon states a defense good at law, then a meritorious defense has been advanced." *United Coin Meter Co., Inc.*, 705 F.2d at 845 (citations omitted). The key concern is "whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default." *INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*, 815 F.2d 391, 399 (6th Cir. 1987) (citing 10 Wright, Miller & Kane, Federal Practice and Procedure § 2697 (1983)).

Trident has made the following claims for relief against AACU: breach of trust, conversion, constructive trust, restitution, and unjust enrichment. (Doc. 27.) AACU asserts that it has a meritorious defense to Trident's claims because its actions have complied with its contractual obligations with Bridford and because Bridford, the trust administrator, approved all

---

> the emails I received in regard to the lawsuit because my attention was focused upon getting the funds back to the Trust and this caused me to be out of the office for long periods.

(*Id*. ¶ 3.) Mr. Lobe also acknowledged that he "understood that [he] had a responsibility to return the Trust finds with the promised 6% returns to the Trust by September 5, 2007." (*Id*. ¶ 4.)

of AACU's actions. AACU also points out that it does not have a written agreement with Trident.

The Court finds these asserted defenses to be good at law. AACU does not dispute that the Goldman Sachs notes in AACU's Fidelity account are intended to secure the payment of principal and interest to the Trust's investors. However, it also is undisputed that both Farmiloe, a Trustee, and Marlow, acting for Bridford, expressly authorized AACU "to do all kinds of financial engineering" with the Trust funds in order to accomplish the Trust scheme. (Lobe Aff. Exs. E and F, doc. 46-7 and 46-8.) Furthermore, Bridford–the entity that had an Agreement with Trident–had custody and control of the Trust funds as late as August 29, 2007, five days before the funds were to be returned to the investors, yet it authorized the transfer of the notes to an AACU account. (Sur-surreply Ex. G, doc. 67-7.) Thus, it cannot be said that the final judgment of this matter on its merits will necessarily result in a finding that AACU is liable to Trident on all of its claims.

The evidence presented to the Court at this stage indicates that AACU may not ultimately succeed on the merits, but that is not the measure. The measure is whether the asserted defense is good at law. Additionally, the Court cannot ignore the Sixth Circuit's articulated preference for trials on the merits and characterization of default as a "harsh sanction." *United Coin Meter Co., Inc.*, 705 F.2d at 846. Because AACU has set forth a meritorious defense, this factor weighs in favor of setting aside the entry of default.

**C.  Prejudice**

Finally, the Court must consider whether setting aside the entry of default will prejudice Trident. "Mere delay in satisfying a plaintiff's claim, if it should succeed at trial, is not

sufficient prejudice to require denial of a motion to set aside a default judgment." *United Coin Meter Co., Inc.*, 705 F.2d at 845 (citing *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 374 (D.C. Cir. 1980)).

Trident's well-grounded concerns in this suit are two-fold: the preservation of the Goldman Sachs notes and other funds in the Fidelity account, and the return of these notes and funds to the Trust's RBS account for distribution to investors. Setting aside the entry of default will not prejudice Trident with regard to the first of these concerns because the temporary restraining order of October 25, 2007, which remains in effect pursuant to agreement of the parties, enjoins AACU and Fidelity from assigning, transferring or otherwise disposing of any portion of the Goldman Sachs Notes in the Fidelity account.

As to the second issue, the prompt return of funds to the Trust's RBS account, the Court notes that the trial schedule will not be disturbed by the inclusion of AACU as a participating party. The Court is aware that, if AACU is not permitted to participate in the lawsuit, the value of the Goldman Sachs notes not subject to a margin balance would be made immediately available to Trident. As of October 31, 2007, market value of the notes in the Fidelity account was $18,900,108.68, and there was a $7,908,470.94 margin loan balance (including interest accrued on the debt). (Doc. 32 at 3.) In other words, a default judgment against AACU would mean the return of approximately $11 million to Trident prior to the resolution of the remaining issues between Trident and Fidelity. Allowing AACU to participate thus prejudices Trident to the extent that the return of these funds, if such return is inevitable, will be delayed by six months.[10]

---

[10] A jury trial on the merits is scheduled for August 25, 2008. (Doc. 59.)

This prejudice to Trident does not outweigh the other two criteria used to determine whether "good cause" has been shown for purposes of granting a motion under Rule 55(c). AACU's culpable conduct did not lead to the entry of default, and it has presented a meritorious defense. Furthermore, the sum at issue here exceeds $18 million, and "matters involving large sums of money should not be determined by default judgments if it can be reasonably avoided." *Rooks v. American Brass Co.*, 263 F.2d 166, 169 (6th Cir. 1959).[11] In consideration of all the relevant factors, the Court concludes that AACU has shown good cause for setting aside the entry of default.

## II.     MOTION FOR LEAVE TO FILE ANSWER OUT OF RULE

Rule 6(b) of the Federal Rules of Civil Procedure provides that when a party moves the court to accept a filing after the relevant deadline, the court may do so "where the failure to [file before the deadline] was the result of excusable neglect." Fed. R. Civ. P. 6(b). A trial court must balance five factors to determine whether the failure to file was the result of excusable neglect: "(1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith." *Nafziger v. McDermott Intern., Inc.*, 467 F.3d 514, 522 (6th Cir. 2006) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).

The Court has already discussed the prejudice to Trident should AACU be permitted to participate in the lawsuit: it is the possible difference of six months in the return of the disputed

---

[11] The factors which control the decision of a Rule 55(c) motion to set aside entry of default also apply to a Rule 60(b) motion to set aside entry of a judgment by default. *United Coin Meter Co., Inc.*, 705 F.2d at 845.

funds. There will be no further delay in the proceedings if AACU is permitted to answer as the Court has already set a scheduling order in the matter. AACU's delay in filing an answer was certainly due to factors within its control, as discussed in depth above, and Mr. Lobe has greatly discredited AACU's cause by filing a false affidavit with the Court. However, for the matter to be decided on its merits, which is plainly the preferred course, the Court must permit AACU to file an answer to the claims against it both presented in Trident's Second Amended Complaint and Fidelity's Cross-Claim.[12]

### III.   MOTION FOR DEFAULT JUDGMENT

The Court's decision to set aside the entry of default as to AACU and to grant AACU's motion for leave to file an answer moots Trident's motion for default judgment.

### CONCLUSION

For the reasons set forth above, the Court hereby GRANTS AACU South Dakota's and AACU Delaware's motion to set aside the entry of default (doc. 46), GRANTS AACU South Dakota's and AACU Delaware's motion for leave to file an answer out of rule (doc. 51), and DENIES Trident's motion for default judgment against AACU South Dakota and AACU Delaware (doc. 43). AACU is ordered to file with the Court its Answer as attached to Document 51.

IT IS SO ORDERED.

        ___s/Susan J. Dlott_____
        Susan J. Dlott
        United States District Judge

---

[12] Fidelity did not oppose AACU's motion for leave to file its answer out of rule.